**GREENHALGH MILLS CORP.,**
**Plaintiff,**

**v.**

**UNITED STATES, Defendant.**

**Court No. 82–6–00806.**

United States Court of
International Trade.

Dec. 2, 1983.

---

United States from England after the same had been used for approximately eleven (11) years in England and then resold to a non-related person after first having been manufactured in Czechoslovakia.

In this action plaintiff challenges the classification and valuation of merchandise and accessories of 306 Elitex Water Jet Looms and Accessories, imported at the Port of Boston during June and July of 1981.

The parties submit this action upon an agreed statement of facts in lieu of trial. Additionally, it has been indicated that the imported merchandise should have been valued at the appraised value less $29,350, which represents transaction value. (Section 402(b) of the Tariff Act of 1930, as amended by the Trade Agreements Act of 1979, P.L. 96–39). This stipulation effectively removes the valuation question as issue for court decision.

The stipulation indicates the merchandise was manufactured in Czechoslovakia and further indicates that it was exported to England in 1968 and 1969 when purchased by Samuel Courtauld & Co. Ltd. (Courtauld). The looms, together with accessories of English origin, were installed in Courtauld's mill in Baintree (Essex), England, during 1968 and 1969 and were in continuous use at the Baintree site from the time of their installation until 1980 when the Baintree mill ceased operation. Also, Courtauld had no intention of reselling or exporting the merchandise to the United States when purchased in 1968 and 1969. In 1981, after the Baintree mill ceased production, the looms were sold to plaintiff, who is unrelated to the seller.

Customs classified the merchandise as weaving machines under TSUS item 670.14, assessing duty pursuant to the Column 2 rate of 40% ad valorem. Plaintiff contends the duty should be assessed at 6.4% ad valorem pursuant to the Column 1 rate of duty under TSUS item 670.14.

The pertinent provisions of TSUS relative to the respective classification made by Customs and claimed by plaintiff and the

Siegel, Mandell & Davidson, New York City (Allan H. Kamnitz and Michelle S. Benjamin, New York City, on briefs), for plaintiff.

J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., Joseph I. Liebman, Atty. in Charge, Commercial Litigation Branch, New York City (Michael P. Maxwell, New York City, on brief), for defendant.

LANDIS, Judge:

This case involves the importation of certain merchandise and accessories into the

duty assessments thereunder are as follows:

General Headnote' 3:

(f) Products of Communist Countries. Notwithstanding any of the foregoing provisions of this headnote, the rates of duty shown in column numbered 2 shall apply to products, whether imported directly or indirectly, of the following countries and areas pursuant to section 401 of the Tariff Classification Act of 1962, to section 231 or 257(e)(2) of the Trade Expansion Act of 1962, or to action taken by the President thereunder:

X X X

Czechoslovakia

X X X

(g) Products of All Other Countries. Products of all countries not previously mentioned in this headnote imported into the Customs territory of the United States are subject to the rates of duty set forth in column numbered 1 of the Schedules.

Schedule 6, Part 4, Subpart E

Weaving machines, knitting machines and textile machines for making lace, net, braid, embroidery trimmings, fabrics, or other textile articles:

| | Rates of Duty | |
| --- | --- | --- |
| | 1 : | 2 |
| 670.14 Weaving machines | 6.4% ad val. | 40% ad val. |

Plaintiff basically argues that Courtauld, the entity from whom it purchased the merchandise, had no intention in 1968–69 of reselling or exporting the merchandise to this country in 1980 and, that the continuous use of the merchandise for over a decade caused it to become a *bona fide* part of English commerce losing all connection with Czechoslovakia and thereby being neither a direct nor indirect import from a communist country.

Defendant argues that General Headnote 3(f), TSUS applies to products of communist countries imported directly or indirectly into the United States, and that in the present case, it is clear that the imported merchandise originated in Czechoslovakia and was "indirectly" imported into the United States in the same condition as manufactured, albeit after long and continuous use in England. Defendant further contends that the use in the intermediate country, England has not changed the merchandise or its purpose as it is imported into the United States in the same condition as exported from Czechoslovakia, accordingly, they are indirect imports from that country.

After reviewing all the evidence of record, including the stipulation entered by the parties, I find that plaintiff has sustained its burden of showing that the imported merchandise had become a *bona fide* part of English commerce thereby severing all contact with the original manufacturing communist country.

The difference between a direct importation and an indirect importation was initially explained by the Customs Court of Patent and Appeals in *United States v. Hercules Antiques, The Danwill Company*, 44 CCPA 209, C.A.D. 662, (1957). The court per Judge Worley, in an opinion concurred in by Judge Rich, stated:

... It is reasonable to assume, therefore, that the words 'imported indirectly' in the proclamation were intended to include merchandise which had been separated from the country in which it originated by something more than mere passage through or transshipment in an intermediate country.

Defendant attempts to interpret the CCPA language to mean that an importation that is not direct must be indirect and therefore still subject to General Headnote 3(f). If defendant's reasoning is followed to its logical conclusion then any product manufactured in a communist country could never lose its identity with the communist country no matter the duration of stay or nature of transaction that product was subject to in the intermediate country. This clearly is not a proper interpretation of the *Hercules* decision. Indeed, Judge Worley, in discussing earlier cases of the Customs Court, went on to say:

It would be difficult, if not impossible, to define exact standards for determining the duration of stay of merchandise in an intermediate country, the nature of the transactions to which it is subjected there, and other circumstances necessary to divest it of its status as an import, direct or indirect, from the Communist-dominated country in which it originated. However, we are of the opinion it must

be established by appropriate evidence that the merchandise has actually become a *bona fide* part of the commerce of the intermediate country. That responsibility which, of course, rests upon the importer has not been satisfactorily discharged here.

Furthermore, Chief Judge Johnson in the opening paragraph of his dissenting opinion in *Hercules*, id. recognized the fact that a product produced in a communist oriented state may lose its identity with that state when the product has become a part of commerce of an intermediate country prior to importation into the United States. Chief Judge Johnson stated:

> I agree with the unanimous decision of the Customs Court that the importer has overcome the presumption of correctness attaching to the collector's classification, and that 'at the time the glassware in question was exported from Holland, it had become part of the commerce of that country and had lost any connection that it had formerly had with Bohemia or Czechoslovakia, or any other nation in which it had been manufactured.'

*Hercules*, id., at 216

It is obvious from this language that while the court could not define exact standards to determine when an import divests itself of its status of being from a communist country, it did contemplate that it is possible to prove divestiture.

The facts in this action clearly show divestiture. The merchandise was installed in a mill located in England where it was in constant operation for a period of twelve (12) years before the mill closed and the merchandise exported to the United States. It would defy logic to say that the mer-

chandise did not become a *bona fide* part of English commerce or to think that Czechoslovakia contemplated it would be sold to the United States twelve years later, whereupon the stipulation specifically states that Courtauld (the purchaser) had no intention of reselling or exporting the looms to the United States when they were purchased in 1968 and 1969. The stipulation also states that the merchandise was installed with accessories of English origin. Further, over a twelve year period maintenance including major part replacement surely must have taken place.[1]

Defendant's reliance upon *United States v. Dessy Enterprises, Inc.*, 47 CCPA 16, C.A.D. 722 (1959) for the conclusion that duration of merchandise in an intermediate country alone is not sufficient to transform merchandise from Column 2 rates to Column 1 rates is not well taken. *Dessy* involved the importation of certain glassware, wall plates, decorated china plates, etc. and contained the appraisers notation on the invoices of being of either "East German or Czecho origin unless otherwise noted ...." The Customs Court sustained the importer's protest on the ground the importer had proved the collector wrong. The CCPA reversed stating the proof offered by the importer fell far short of satisfying its dual burden.

Apparently some of the merchandise in *Dessy* was manufactured long before Czechoslovakia came under communist influence. In reviewing the opinion of the Customs Court, the CCPA stated:

> We take the above to mean that the statute and proclamation might be so construed as to require a distinction between those goods manufactured *prior*

---

1. A stipulation of facts adopted by a trial court is, perhaps, the strongest factual finding that can be made. There is no necessity to evaluate the credibility of witnesses nor to evaluate the impeachment value of cross-examination. The particular facts are agreed to and admitted by the parties. The Court of Customs and Patent Appeals (now the United States Court of Appeals for the Federal Circuit) has historically maintained that the review of factual determinations of the Customs Court is limited to inquiry as to whether the finding is based upon substantial evidence in support thereof or whether it is clearly contrary to the weight of evidence. *Pistorino & Co., Inc. v. United States*, 67 CCPA 1, C.A.D. 1234, 607 F.2d 989 (1979); *C. Itoh & Co. America, Inc. v. United States*, 69 CCPA —, 678 F.2d 218 (1982); generally, 28 U.S.C. § 2601(c) (as amended by the Customs Courts Act of 1980, Pub.L. 96–417, Title IV, § 403(d), Title V, § 501(28) (Oct. 10, 1980). Substantial evidence is particularly borne out by the stipulation in the present action.

to Communist domination and those manufactured *after* such domination. However, as we tried to point out in *Hercules*, [2] the obvious purpose of the statute is to deny to Communist-dominated countries the benefit of reduced duties; therefore, it would seem immaterial at what time the goods were produced. Indeed, it appears that a different conclusion would lead to a granting of reduced duty on so-called 'old' articles of commerce exported from Iron Curtain countries and denial of such reduction to so-called 'new' articles.

*Dessy*, 20 (Emphasis in original)

The *Dessy* case does not refer to a time duration of how long the goods were in an intermediate country. The decision merely holds that there is no difference under the intent and application of the statute as to the time when the article was manufactured, whether it be pre or post-communist domination. According to the CCPA "the obvious purpose of the statute is to deny communist-dominated countries the benefit of reduced duties.

This basic intent is directly on point in the instant action. By 1980, Czechoslovakia could not reasonably be held as receiving a benefit because of a benefit bestowed by a reduced duty which later happened to exist between an English and an American company. This transaction was purely a commercial one between entities from England and the United States. All ties between Czechoslovakia and the underlying merchandise had been long severed by reason of its sale and usage by an English enterprise located in England. The merchandise was not kept in a warehouse or other storage facility to resell at a later date. Rather, it was *immediately installed and used continuously on a regular basis by the English purchaser* for more than ten years, thus, becoming a *bona fide* part of commerce of that country.

Accordingly, judgment shall enter for plaintiff.

Let judgment enter accordingly.